**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 31 2014, 9:33 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**VICTORIA L. BAILEY**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KARL M. SCHARNBERG**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MARK McCOY, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A05-1310-CR-531 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Grant W. Hawkins, Judge
Cause No. 49G05-1203-FA-18546

**July 31, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

Appellant-Defendant, Mark McCoy (McCoy), appeals his conviction for Counts II, XX and XXV, child molesting, Class A felonies, Ind. Code §§ 35-42-4-3(a)(1) and 35-41-2-4; Count IX, criminal confinement, a Class C felony, I.C. § 35-42-3-3; Count XI, intimidation, a Class C felony, I.C. § 35-45-2-1; and Count XXIII, child molesting, a Class C felony, I.C. §§ 35-42-4-3(b) and 35-41-2-4.

We affirm.

## ISSUE

McCoy raises one issue on appeal, which we restate as: Whether the trial court abused its discretion by admitting certain testimony at trial.

## FACTS AND PROCEDURAL HISTORY

McCoy began dating Beverly Cooper (Cooper) on and off after the two met at a bar in 2010. In January of 2011, Cooper and her nine-year-old son, C.C., moved in to McCoy's home in Indianapolis, Indiana, where two of McCoy's three sons, eight-year-old C.M. and ten-year-old D.M., also lived. Approximately one week after Cooper and C.C. moved in, the three boys heard McCoy and Cooper having sex. C.M. and D.M. went down the hall and peeked through a crack in the door of the room that McCoy and Cooper shared to watch them having sex. C.C. was down the hall in the room that the three boys shared, and C.M. and D.M. called him to come watch with them. At this point, McCoy heard C.M. and D.M. giggle outside the door. McCoy then instructed all three boys to come inside the room.

2

C.M. and D.M. went inside the room willingly. C.C. did not want to go inside the room, so C.M. and D.M. grabbed him and drug him inside. One of the boys shut the door behind C.C. and when C.C. attempted to leave, McCoy told him not to touch the door in a demanding, angry voice. When McCoy asked the boys why they were peeking through the door, C.M. and D.M. said they were interested in what McCoy and Cooper were doing. McCoy then instructed the boys to undress, and C.M. and D.M. disrobed. C.C. did not undress and said that he knew it was wrong. McCoy demanded that C.C. undress. C.C. felt compelled to follow the instruction because of the stern voice McCoy used and because he noticed that McCoy's handgun was right next to him on the dresser.

After disrobing, C.M. and D.M. asked McCoy what they should do next. McCoy pinned Cooper face-down on the bed and instructed the boys to reenact what they had observed through the door. C.M. attempted to have anal intercourse with Cooper while McCoy held her down. D.M. subsequently took his turn and attempted to have anal intercourse with Cooper. C.M. and D.M. then dragged C.C. onto the bed and told him to try. C.C. resisted, but C.M. and D.M. pushed his pelvis down and his penis touched Cooper's buttocks but did not penetrate her anus. McCoy then flipped Cooper over so that she was lying on her back.

While McCoy held Cooper down on her back, he allowed C.M. to attempt to have vaginal intercourse with Cooper as she squirmed to attempt to prevent it. C.M. then moved near Cooper's head and placed his penis in her mouth before she could turn her head away. D.M. then attempted to do the same. During this time, C.C. had put his

3

clothes back on. McCoy again demanded C.C. to undress and try to have vaginal sexual intercourse with Cooper—his mother. C.M. and D.M. pushed C.C. onto Cooper, causing his penis to touch her, but it did not touch her vagina. C.C. subsequently rolled off the bed, but C.M. and D.M. pushed him back onto the bed and climbed onto the bed too. C.M. touched Cooper's breasts, followed by D.M doing the same. McCoy then allowed Cooper to get up, and McCoy left the room. After these events, C.C. was upset and Cooper consoled him but also told him not to tell anyone what had happened.

At some later point, C.C., C.M., and D.M. were in their room watching a pornographic video that McCoy had given them. Cooper walked into the room and turned the video off. She told them that they were not allowed to watch those types of videos and discussed the reasons why. During this discussion, McCoy walked into the room and grabbed Cooper; he then pinned her to the bed and pulled her pants down. He instructed C.C. to put his mouth on her vagina, so C.C. touched her vagina with his chin. After these events, McCoy, with his hand on his gun, told C.C., "If you tell anyone I'll shoot you." (Transcript p. 73).

Two weeks after Cooper and C.C. moved in, McCoy moved out of the Indianapolis house. In September of 2011, McCoy, D.M., and C.M. moved to Washington, in Daviess County, Indiana, to live with McCoy's mother and stepfather. While staying there, McCoy told his stepfather, Jeffrey Scheid (Scheid), that Cooper "used to let [C.M. and D.M.] mess around with her." (Tr. p. 407). As a result of this and other statements, on January 25, 2012, Scheid contacted the Daviess County Sheriff's

4

Department, and an investigation ensued. The supervisor of the Daviess County Department of Child Services (DCS), Briley Terrell (Terrell), sat in on Scheid's interview and subsequently went to Scheid's house. After getting permission from McCoy, Terrell and a Daviess County Detective took C.M. and D.M. to the police department for interviews. There, C.M. told Terrell that McCoy would ask him to "use a rubber thing on his ex-girlfriend, [Cooper]." (Tr. p. 363). D.M. told Terrell that McCoy asked D.M., C.M., and C.C. "to play with [Cooper's] boobs and vagina." (Tr. p. 364). Terrell determined that C.M. and D.M. should be removed from McCoy's custody. C.M. and D.M. were placed in a foster home and eventually, the maternal grandparents of C.M. and D.M. acquired a guardianship over the boys. Terrell later turned the case over to Kristi Wilmes (Wilmes) of the Daviess County DCS, who served as the ongoing case manager.

On February 3, 2012, the Daviess County DCS contacted the Marion County DCS, and Jessica Price (Price) initiated an investigation in Marion County. On February 7, 2012, Price went to C.C.'s school and asked to speak with him. When she brought up McCoy's name, "[C.C.'s] whole posture closed down, he crossed his arms, he had red hives all over, he started crying, [and] he was starting to get really fidgety. . . [and] uncomfortable." (Tr. p. 252). C.C. told Price that McCoy was a "bad man" and briefly explained "why he felt that way." (Tr. p. 253). Price subsequently ended the interview with C.C. On March 22, 2012, Detective Christopher Lawrence of the Indianapolis Metropolitan Police Department interviewed Cooper about the events, and she confirmed

5

that the events had occurred. That same day, the State filed an Information charging McCoy with twenty-eight Counts.

Around May 9, 2012, Wilmes met with C.M. and D.M. separately and went through each of the twenty-eight charges, one by one. During his interview, D.M. confirmed that all three boys had been instructed to engage in the various acts with Cooper.

On September 30 and October 1, 2013, a bench trial was conducted, during which McCoy acted *pro se*. At trial, Wilmes testified regarding what C.M. and D.M. had shared with her during their interviews. At the close of evidence, the trial court found McCoy guilty of Counts II, XX, and XV, child molesting, Class A felonies, I.C. §§ 35-42-4-3 and 35-41-2-4; Count IX, criminal confinement, a Class C felony, I.C. § 35-42-3-3; Count XI, intimidation, a Class C felony, I.C. § 35-45-2-1; and Count XXIII, child molesting, a Class C felony, I.C. §§ 35-42-4-3 and 35-41-2-4. A sentencing hearing was held on October 17, 2013, and McCoy received an aggregate sentence of ninety-three years.

McCoy now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

On appeal, McCoy is only challenging the three Counts involving D.M.—Counts XX, XXIII, and XXV. McCoy argues that the trial court abused its discretion when it admitted certain testimony into evidence at trial. Specifically, he maintains that the trial court should have excluded Wilmes' testimony that D.M. told her that the allegations against McCoy were true and that D.M. confirmed the substance of each charged Count

separately. When Wilmes testified about D.M.'s statements during trial, McCoy did not object. McCoy now disputes the admission of the testimony on the basis that it was inadmissible hearsay evidence under Indiana Evidence Rule 801(c).

The admission or exclusion of evidence is within the sound discretion of the trial court "and is afforded great deference on appeal." *Eastwood v. State*, 984 N.E.2d 637, 640 (Ind. Ct. App. 2012), *trans. denied*. "An abuse of discretion occurs when the trial court's decision is clearly erroneous and against the logic and effect of the facts and circumstances before it or it misinterprets the law." *Id.* "Any error caused by the admission of evidence is harmless error for which we will not reverse . . . if the erroneously admitted evidence was cumulative of other evidence appropriately admitted." *Iqbal v. State*, 805 N.E.2d 401, 406 (Ind. Ct. App. 2004).

Indiana Evidence Rule 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pursuant to Indiana Evidence Rules 802 and 803, hearsay is not admissible unless it fits within some exception to the hearsay rule. Failing to object to the admission of evidence "at trial waives any claim of error and allows otherwise inadmissible hearsay evidence to be considered for substantive purposes." *Johnson v. State*, 734 N.E.2d 530 (Ind. 2000). However, a claim "waived by a defendant's failure to raise a contemporaneous objection can be reviewed on appeal if the reviewing court determines that a fundamental error occurred. *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010). Because McCoy failed to make a contemporaneous

7

objection at trial, he must now show on appeal that the admission of the testimony was fundamental error.

The fundamental error exception is extremely narrow and is applicable only where an "error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Mathews v. State*, 849 N.E.2d 578, 587 (Ind. 2006). The error "must either 'make a fair trial impossible' or constitute 'clearly blatant violations of basic and elementary principles of due process.'" *Brown*, 929 N.E.2d at 207 (Ind. 2010) (quoting *Clark v. State*, 915 N.E.2d 126, 131 (Ind. 2009)), *reh'g denied*. The mere fact that error has occurred and that it will prejudice a defendant is not sufficient to invoke the fundamental error exception; "[r]ather, the error must be one such that the defendant could not possibly have had a fair trial or such that this court is left with the conviction that the verdict . . . is clearly wrong or of such dubious validity that justice cannot permit it to stand." *Stewart v. State*, 567 N.E.2d 171, 174 (Ind. Ct. App. 1991), *trans. denied*.

McCoy's entire argument on appeal is based on his inaccurate assertion that the trial court's judgment for Counts XX, XXIII, and XV was based solely on Wilmes' testimony regarding the statements that D.M. made to her. McCoy argues that fundamental error occurred because inadmissible hearsay evidence was admitted and relied on by the trial court and that it was the only evidence presented at trial that is favorable to the judgment of the court; however, there was, in fact, additional evidence provided by the State and relied upon by the trial court. At trial, the court explained,

8

"[D.M.], however, couldn't remember anything happening. Didn't say anything – didn't say it didn't happen, he just said he couldn't remember but said he told . . . Wilmes the truth. I looked at [D.M.]'s statement, I looked at [C.C.]'s statement and found a combination of [C]ounts, I believe, where I feel comfortable convicting." (Tr. p. 498). Thus, the trial court clearly considered D.M.'s testimony that he had been truthful with Wilmes, along with Wilmes' testimony, and the evidence provided by C.C. Collectively, this evidence led the trial court to its guilty verdict for Counts XX, XXIII, and XXV.

Furthermore, we note that the State provided ample evidence in addition to Wilmes' testimony about D.M.'s statements to prove Counts XX, XXIII, and XXV, including the unchallenged testimony of both C.C. and Cooper. During the trial, C.C. testified that D.M.'s "[front private part] was touching [Cooper's] front private part but she was moving trying not to let him."[1] (Tr. p. 55). He also stated that D.M. was "moving his waist trying to . . . stick his front private in [Cooper]'s back private" as Cooper "move[d] around trying not to let him," and McCoy was "holding [Cooper]'s hands." (Tr. p. 42-43). C.C. also testified that D.M. touched Cooper's "boobs [but] not for very long." (Tr. p. 60). In addition, Cooper testified that McCoy "[g]rabbed her arms . . . below the shoulders and then had pulled [her] backwards onto her back." (Tr. pp. 159-60). He then "told the boys to put their penis[es] in [her] mouth." (Tr. p. 160). According to Cooper, "[D.M.] put his penis on [her] face . . . [i]t might have hit [her] lips

---

[1] Eleven-year-old C.C. testified that a "wiener" is the "private part" that is at "[t]he front around the waist" and is used for "[g]oing to the bathroom." (Tr. p. 38).

but not like actually all the way in." (Tr. p. 163). Thus, the State presented the trial court with more than just Wilmes' hearsay testimony. Where evidence is merely cumulative, there is no fundamental error. *Wilkes v. State*, 7 N.E.3d 402 (Ind. Ct. App. 2014).

Because the hearsay testimony of Wilmes was sufficiently corroborated by other evidence, we cannot say that its admission made a fair trial impossible, nor was it a blatant violation of the fundamental due process principle that a crime must be proven beyond a reasonable doubt. *See Delarosa v. State*, 938 N.E.2d 690, 695 (Ind. 2010). Accordingly, we find that any error in the admission of Wilmes' testimony based on inadmissible hearsay is harmless—not fundamental. *See Meadows v. State*, 785 N.E.2d 1112, 1122 (Ind. Ct. App. 2003), *trans. denied*.

## CONCLUSION

Based on the foregoing, we conclude that the trial court did not abuse its discretion by admitting and relying on Wilmes' testimony at trial.

Affirmed.

ROBB, J. and BRADFORD, J. concur